LAW OFFICES OF LELAND B. ALTSCHULER
Leland B. Altschuler (CA SBN 81459)
    2995 Woodside Road, Ste. 350
    Woodside, CA  94062
    650.328.7917
    650.989.4200 (Fax)
    Lee@AltschulerLaw.com
    Counsel For: Dana Wilkey, Defendant

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(SAN JOSE VENUE)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　Plaintiff,<br><br>　　　　v.<br><br>SKYLAR PHOENIX, LISSA PHOENIX and DANA WILKEY,<br><br>　　　　　Defendants.<br>_____/ | CR No. 14-00318 LHK PSG<br><br>STATUS REPORT BY DANA WILKEY<br><br>Date:  September 24, 2014<br>Time:  1:30 P.M. |

INTRODUCTION.

By undersigned counsel, Dana Wilkey provides this Status Report to assist the Court in considering an Order for an exclusion of time under the Speedy Trial Act that would allow counsel adequate time for preparation. In the following order, this Report provides:  1) a summary of the Indictment's allegations; 2) a description of a pleading defect in the indictment as to Ms. Wilkey that the Government may decide to remedy without a formal motion; and 3) the status of discovery.

September 24, 2014 will be the first hearing at which all three accused individuals will appear in court at the same time. Undersigned and other counsel will request a new

status date for early 2015.

All three accused individuals are represented, and out of custody.

### DISCUSSION.

1. **THE ALLEGATIONS OF THE INDICTMENT.**

Skylar Phoenix was employed by Blue Shield of California in the Marketing Department located in San Francisco, according to the Indictment. Ind., Para. 1 (hereafter, "Para." refers to a paragraph of the Indictment). Lissa Beckwith was her registered domestic partner. Para. 3. They are both residents of the Northern District of California.

Blue Shield is an insurance company with approximately $10.5 billion in annual revenues and about 5,000 employees. As to its employees, Blue Shield had internal ethics and conflicts policies (Para. 5), as well as other policies. The "Blue Shield Code of Business Conduct" is a corporate standard that seemingly prohibits activities that have the *appearance* of influencing an employee's objective decision-making (as well as actual conflicts of interest).[1]

Dana Wilkey was the President of Adwil Agency, Inc., located in Southern California. Para. 6. Now, Ms. Wilkey is a resident of the Southern District of Florida.

The Indictment alleges various schemes to defraud Blue Shield. Defendants Skylar Phoenix and Lissa Phoenix are charged in the first scheme to defraud; all defendants are charged in the second scheme. There are also substantive wire fraud counts naming some but not all defendants as well as section 1001 counts. The following summarizes the charges, and for convenience a chart is provided, *post*, as Exh. "A."

---

[1] "A conflict of interest occurs when outside activities, including outside employment, influence or *appear to influence*, the ability to make objective decisions." *Code of Business Conduct and Compliance Program*. Blue Shield of California (2006) produced in discovery as BSC 000851.

### A. The First Scheme To Defraud (Cts. 1-5).

The first scheme to defraud involves Skylar Phoenix and Lissa Phoenix. Count 1 alleges a wire fraud conspiracy count. Counts 2 through 5 allege substantive wire fraud (and aiding and abetting) violations. Paras. 10-19.

The first scheme has two components to it. The first component relates to the period between September 2004 and April 2006. Paras. 11-13. The second component relates to the period between January 2007 and March 2011. Paras. 14-19.

The first scheme also refers to a similar-sounding business with the name Adwil Communications. Ms. Wilkey's business was Adwil Agency, Inc., not Adwil Communications. She has no knowledge of the latter. The Indictment does not directly or indirectly allege otherwise.

### B. The Second Scheme to Defraud (Cts. 6-12).

The second scheme asserts a wire fraud conspiracy count against all defendants (Ct. 6) and six substantive wire fraud counts against Ms. Wilkey and Ms. Skylar Phoenix. Cts. 7-12. The conspiracy count alleges that Dana Wilkey and Skylar Phoenix entered into a fraudulent marketing contract between Blue Shield and Adwil Agency, Inc., which included the regular payment of undisclosed kickbacks. There are allegations of "highly inflated invoices," cost center mischarging of those invoices, and Blue Shield paying Adwil Agency faster and before other vendors, all as part of the scheme. Paras. 24-31.

### C. The False Statement Counts (Cts. 13-15).

The Indictment alleges false statements to government agents by Skylar Phoenix (Counts Thirteen and Fourteen) and Lissa Phoenix (Count Fifteen). The false statement claims are based on F.B.I. interviews of the two on September 25, 2013. The Indictment does not claim that Ms. Wilkey made any false statements to the FBI in her interview,

although she was interviewed in Florida at the same time.

In Count 14, one of Ms. Skylar Phoenix's statements was that "she was working an outside job" with Adwil Agency during the same time as Adwil Agency was performing its contract with Blue Shield, which is an exculpatory statement as to Ms. Wilkey.

As for Ms. Wilkey and her company Adwil Agency, Inc., they were in fact a vendor to Blue Shield of California. Para. 7. According to the Indictment, Adwil Agency, Inc. provided "internet-type" services work, including website creation. Para. 25.

**2. AS TO MS. WILKEY, THE INDICTMENT IS DEFECTIVE AND CONFUSING.**

The basis of the second scheme (Ct. 6) is the claim that Ms. Wilkey paid kickbacks to Skylar Phoenix to secure business from Blue Shield. However, the charging allegations in the Indictment are defective and must be remedied for this case to proceed. Further, there are extraneous allegations in the Indictment that raise issues that need to be addressed by the Government because those allegations will impact and significantly expand discovery and pretrial preparation, as well as trial length.

Federal law proscribes the payment of kickbacks through the "honest services" fraud provision of the mail and wire fraud statutes. Title 18 U.S.C. § 1346 expands the definition of a scheme and artifice to defraud to include "a scheme or artifice to deprive another of the intangible right of honest services." Relevant here is that the Supreme Court explained in *Skilling v. United States*, 130 S.Ct. 2896, 2931 (2010) and *Black v. United States*, 130 S.Ct. 2963, 2968 (2010) that honest services fraud criminalizes schemes to defraud that involve kickbacks. The *quid pro quo* requirement to satisfy this element is contained within Ninth Circuit *Manual of Model Criminal Jury Instructions*, No. 8.123 (2010) (using language of "in exchange for").

1  More importantly, however, the law does *not* criminalize undisclosed conflicts of

2  interest or undisclosed self-dealing. *Skilling*, 130 S. Ct. at 2932; Ninth Circuit Model

3  Instruction No. 8.123, Comment, Para. 1 (citing *Skilling*).

4  The Ninth Circuit has also recently made clear how an honest services fraud

5  charge must be pled. In *United States v. Avery*, 719 F.3d 1080, 1083 (9th Cir. 2013), the

6  Court of Appeals explained the requirement that Section 1346 be pled in the indictment

7  when the Government is proceeding on an honest services fraud claim. "[T]o charge a

8  defendant with committing honest services fraud, the government is required to

9  include in the charging document references to both §§ 1343 (or 1341) and 1346." In

10 *Avery*, the Ninth Circuit held that the defendant was entitled to § 2255 relief after he

11 pled guilty to an information with that defect.

12 The Indictment against Ms. Wilkey, while pleading a claim of paying kickbacks,

13 makes no reference to 18 U.S.C. § 1346. Pursuant to Rule 12(b)(3)(B), Fed.R.Crim.P., Ms.

14 Wilkey will move, if necessary, to dismiss based on this pleading defect. However,

15 undersigned counsel raises this issue because the Government can voluntarily remedy

16 this defect without the need for formal motion practice.

17 Additionally, Ms. Wilkey raises this defect because, notwithstanding the fact that

18 second scheme alleges a kickback claim, the second scheme also includes allegations

19 unrelated to a kickback case. Those additional allegations will lead to more discovery,

20 more pretrial work and a longer trial.

21 We alert the Court to this issue now, so that the Court may inquire as to the

22 Government's intention in presenting this case. Based on the Government's response,

23 the Court and counsel can appropriately respond as to the discovery and pretrial

24 preparation that would be necessary.

25

More specifically, here is the issue: While Paras. 24, 28 and 29 (and the specific payments identified in Counts 7 through 12) relate to the alleged payments of kickbacks, Paragraphs 25 and 26 make additional allegations that are in the nature of a classic money-or-property based wire fraud prosecution:

- <u>Paragraph 25</u>:  That to conceal the scheme to defraud, multiple work orders were generated and approved "with numerous cost increases and extensions being added over time;"

- <u>Paragraph 26</u>:  That the project cost center or code was changed to conceal the cost of invoices and extensions; and

- <u>Paragraph 26</u>:  That multiple (but unspecified) invoices charging B.S.C. "highly inflated prices" were submitted.

The Courts have described those as "core mail and wire fraud jurisprudence" under 18 U.S.C. §§ 1341 and 1343. *See United States v. Avery*, 719 F.3d at 1085 and n. 3; *see also* Ninth Circuit Model Criminal Jury Instruction No. 8.124.

We are unsure whether the allegations related to the submission of "inflated invoice" and other matters was intended by the Government to be evidence to prove the criminal intent of the accused, or if instead the Government intended to charge a money-or-property based wire fraud prosecution in addition to an honest services fraud. If the Government intends to bundle both types of frauds in a single count of prosecution, then the allegations need to be made clear in the Indictment. If, however, the Government did not intend to proceed on a traditional wire fraud theory and is proceeding only on an honest services fraud theory, that position should be made clear at the status conference.

The reason the defense needs to know is that there is a substantial difference in the time, and type of discovery and pretrial preparation required to defend on one approach or both. A fraud theory based on alleged inflated invoices and the other above

matters is significantly broader and more extensive than a kickback case.

Here are some differences specific to this case that will impact the amount of reasonable preparation necessary.

**The "Work Order" allegation**:  Presumably this means Blue Shield's "Statements of Work." Approximately 32 SOW's have been produced to date. The SOW's include: construction and adjustment of on-line applications; website construction, maintenance, and hosting; server management; e-mail marketing campaigns; copy writing for employee newsletters; and other services. The SOW's transparently detail: Adwil Agency's qualifications for the work; the expected deliverables; price; progress reporting and due dates for the deliverables; and independent product testing at Blue Shield and product acceptance by Blue Shield Product Managers and IT staff. Payment was due under written invoice only after product acceptance, on payment terms stated in the SOWs. If the prosecution contends there is something wrong with the SOWs, then, presumably the prosecution will identify the SOWs and the element(s) at issue; otherwise each element of each SOW is a potential item for defense investigation

**The "mischarging of invoices to the wrong cost center" allegation:** The issues for defense investigation are: what were the insurance company's actual invoice coding policies; whether there was in fact any invoice miscoding; whether particular invoices were miscoded at a rate higher rate than all other invoices were miscoded; and if there were miscoding, whether it amounts to anything more than inadvertent work error. In discovery reviewed to date, the Government has not yet provided particulars of the claimed coding errors or underlying policies, nor at this time does counsel know what an acceptable error rate in coding might be.

**The "numerous inflated invoices" allegation**:  We believe there about three hundred to four hundred invoices.  We don't know how many invoices the Grand Jury

and the prosecution have in mind; nor do we know how any invoice might be viewed as "inflated;" nor do we know by how much. To defend this claim as alleged, there is an arduous task ahead: locate the hundreds of invoices; identify the ones which the Grand Jury put at issue (over six-plus years at issue); determine invoices which the prosecution claims are somehow improper or are Rule 404(b) matters or other potential trial evidence; measure and establish the reasonableness of those invoices; and potentially examine other invoices as well. In addition, the defense will need to undertake the factual and legal analysis of figuring out if or how a price can move from "fair" in a free-market economy to an amount so "highly inflated" that a jury may consider any such invoices as evidence of a criminal offense.

To answer these allegations, trial would include additional fact witnesses to address the issues of the work performed by Adwil, as well as expert testimony regarding the value of those services. In short, the pretrial preparation, and the trial of a money-for-property fraud case is geometrically more extensive than the trial of a kickback case.

The prosecution and defense of the kickback claim, on the other hand, would focus on whether the Government could prove that Skylar Phoenix was being paid with the intent to cheat Blue Shield and as a *quid pro quo* for business secured from Blue Shield.

Undersigned counsel respectfully submits that the Government should discuss at the status conference the fraud theory on which it intends to proceed so that the Court and the parties can properly plan discovery and the pretrial schedule.

3. **DISCOVERY.**

To date, the Government has produced about 5700 pages of Bates-numbered

discovery on CD. The pressing discovery issues are:

- The Government needs to provide a password to complete production on six CDs, which are partially readable but not searchable (the second set of discovery was provided, without an accompanying index, by letter dated August 8, 2014);

- We request a deadline for the Government to produce the third and presumably final set of discovery because:
  - An unknown volume of materials still needs to be produced;
  - As detailed below, the defense is still missing e-mail between or among the accused, as well as internal Blue Shield e-mails relating to the allegations of the Indictment;

- The Government needs to Bates number the unknown number of documents already produced without Bates numbers.

Counsel are cooperating in addressing technical discovery and ESI matters. We expect that the ESI matters will be resolved without judicial involvement and that the Government will provide necessary information and timetables shortly.

In addition, it appears that Blue Shield produced to the United States Attorney some parts of their internal investigation that is helpful to the insurance company's narrative.[2] We expect that there is other information that Blue Shield has not produced to the Government, but which needs to be produced, including *Brady* material. The unproduced information is therefore within the "control" of the government, even if not physically in the offices of the F.B.I. or United States Attorney.

As for email, discovery indicates that Blue Shield corporate investigators harvested ESI from multiple employee computers. Three issues arise.

**First**, company investigators have neither the legal obligation nor the appropriate training to seek out or to assess evidence favorable to the accused and material to guilt

---

[2] The corporate investigation included: written employee surveys; interviews and apparently the audio recording of employees; forensic searching of employee computers for key terms; and running hundreds of pages of private database surveys on its own employees and individuals unconnected to Blue Shield.

or punishment, nor other information the defense is entitled to have. *Brady* obligations cannot be outsourced. Those facts argue in favor of more substantial voluntary production than the limited number of e-mails provided to date.

**Second**, *all* the e-mail traffic at Blue Shield between or among Skylar Phoenix and Dana Wilkey (as well as a few specific other individuals) is relevant and should be produced. Considering the Indictment puts at least six years at issue, e-mail production between Ms. Wilkey and Ms. Phoenix is incomplete, at least by reference to the limited number of pages of e-mail produced so far. Particularly with the Court's informal encouragement, counsel should be able to work this out.

**Third**, here is a helpful benchmark as to the volume of ESI relating to e-mail remaining to be produced: Discovery reveals that Blue Shield searched more than 190,000 messages and had more than 9,000 hits on **their** search terms.[3] Given that fact, there is certainly much discovery at Blue Shield relevant to the charges and to our investigation and defenses. It needs to be voluntarily produced.

## CONCLUSION

For the reasons stated, we respectfully the Court will enter an Order adjourning this matter to a mutually convenient and appropriate date for further status proceedings.

DATED: September 19, 2014.

                                                        LAW OFFICES OF LELAND B. ALTSCHULER

                                                        By: _____
                                                             Leland B. Altschuler
                                                             Attorney for Defendant DANA WILKEY

---

[3] The discovery document that reveals this is a Blue Shield document summarizing one requested search on ESI of Skylar Phoenix and Dana Wilkey. BSC 003198.

Exhibit "A"

Summary of Charges

(Cr. No. 14-00318 LHK PSG)

| COUNT NO. | DESCRIPTION | STATUTE | ACCUSED |
|---|---|---|---|
| 1 | Wire fraud conspiracy (scheme no. 1) | 18 U.S.C. § 1349 | Skylar Phoenix<br>Lissa Phoenix |
| 2-5 | Substantive counts re: above | 18 U.S.C. §§ 1343 and 2 | Skylar Phoenix<br>Lissa Phoenix |
| 6 | Wire fraud conspiracy (scheme no. 2) | 18 U.S.C. § 1349 | Skylar Phoenix<br>Lissa Phoenix<br>Dana Wilkey |
| 7-12 | Substantive counts re: above | 18 U.S.C. §§ 1343 and 2 | Skylar Phoenix<br>Dana Wilkey |
| 13 | False Statement | 18 U.S.C. § 1001 | Skylar Phoenix |
| 14 | False Statement | 18 U.S.C. § 1001 | Skylar Phoenix |
| 15 | False Statement | 18 U.S.C. § 1001 | Lissa Phoenix |

*CERTIFICATE OF SERVICE*

I, Leland B. Altschuler, am a member of the State Bar of California and admitted to practice in the Northern District of California. I state that on this date, through the ECF system, I caused a copy of the within:

STATUS REPORT BY DANA WILKEY

to be provided to:

- AUSA Amie Rooney at the Office of the United States Attorney, 150 Almaden Boulevard, Ste. 900, San Jose, CA 95113, California;

- Vicki Young, Esq., 706 Cowper Street, Suite 205, Palo Alto, California 94301; and

- AFPD Robert M. Carlin, Office of the Federal Public Defender, 55 S Market St., Ste. 820, San Jose, CA 95113

Dated: September 12, 2014.

/s/
_____
Leland B. Altschuler