1  BRIAN J. STRETCH (CABN 163973)
   United States Attorney
2
   BARBARA J. VALLIERE (DCBN 439353)
3  Chief, Criminal Division

4  AMIE D. ROONEY (CABN 215324)
   MAIA T. PEREZ (MABN 672328)
5  Assistant United States Attorney

6      150 Almaden Boulevard, Suite 900
       San Jose, California 95113
7      Telephone: (408) 535-5061
       FAX: (408) 535-5066
8      Amie.Rooney@usdoj.gov

9  Attorneys for United States of America

10                      UNITED STATES DISTRICT COURT

11                     NORTHERN DISTRICT OF CALIFORNIA

12                              SAN JOSE DIVISION

13

14  UNITED STATES OF AMERICA,        ) Case No. CR14-0318-LHK
                                     )
15           Plaintiff,               )
                                     ) **UNITED STATES' SENTENCING**
16      v.                            ) **MEMORANUDUM**
                                     )
17  DANA WILKEY,                      )
                                     ) Date:  October 19, 2016
18           Defendant.               ) Time:  9:45 a.m.
                                     ) Honorable Lucy H. Koh
19

20                                **INTRODUCTION**

21       On March 15, 2016, defendant Dana Wilkey (hereinafter "the defendant") pled guilty pursuant to

22  a plea agreement to a Superseding Information charging her with misprision of a felony, in violation of

23  18 U.S.C. § 4. Sentencing is scheduled for October 19, 2016 at 9:45 a.m.

24       The government has reviewed the Presentence Report ("PSR") and has no objection to the

25  contents of the report. The Probation Officer calculated the defendant's adjusted offense level to be 9;

26  and the defendant's Criminal History Category is I. This results in a sentencing range of 4 to 10 months

27  for misprision of the felony of wire fraud. Officer Libby has recommended that the Court sentence the

28  defendant to 5 years' probation, with a condition of six months of electronic monitoring. The

government acknowledges that this is a reasonable sentencing recommendation, and for the reasons discussed below, taking into account all the sentencing factors under Section 3553(a), the government concurs and likewise recommends that the Court impose a sentence of 5 years' probation, with six months of home detention with electronic monitoring.

## DISCUSSION

**I.     The Sentencing Guidelines Calculation.**

Under *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court ruled that the federal Sentencing Guidelines are "effectively advisory," and that "[t]he district court, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id*. at 245-46.  *See also* 18 U.S.C. § 3553(a)(4).  In the instant case, the starting place is the calculation of the applicable guideline range.  In the plea agreement, the parties reserved the right to contest the loss calculation and the defendant's role in the offense, but nevertheless included the following calculation:

Wire Fraud

| | | | |
|---|---|---|---|
| a. | Underlying Base Offense Level: (U.S.S.G. § 2B1.1) | | 6 |
| | Specific offense characteristics: (U.S.S.G. § 2B1.1(b)(1)(H) - Loss More Than $550,000 but less than $1,500,000) | | +14 |
| | Adjusted Offense Level | | 20 |
| b. | Revised Base Offense Level (U.S.S.G. § 2X4.1) | | 11[1] |
| c. | Acceptance of Responsibility: | | -2 |
| d. | Final Adjusted Offense Level: | | 9 |

An adjusted offense level of 9, when indexed with Criminal History Category I, results in a guideline range for sentencing of 4 to 10 months' imprisonment, which is in Zone B.

**II.     The Government's Sentencing Recommendation.**

After considering the Sentencing Guidelines and factors outlined in 18 U.S.C. § 3553(a) , the government believes that a sentence of 5 years' probation, with six months of home confinement

---

[1] Pursuant to U.S.S.G. § 2X4.1, the base offense level is 9 levels lower than the offense level for the underlying offense, but in no event less than 4.

through electronic monitoring, together with payment of restitution, is a reasonable and appropriate sentence.

The instant offense is accurately described in the PSR. [*See* PSR, ¶¶ 7-18.] The parties could not agree at the time of the guilty plea on the issue of the loss calculation [PSR, ¶ 19], but have met and conferred more recently and, while counsel continue to disagree over the precise valuation of the work provided to BSC, we have come to an agreement that the loss is at least $550,000 for purposes of determining the guideline range. The government submits its explanation of a reasonable loss calculation below.

### A.  Burden Of Proof

The government bears the burden of proof on the facts underlying the sentencing enhancement. *United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005). A district court's findings of fact at sentencing, including those used in calculating the loss amount, must be supported by a preponderance of the evidence. *United States v. Armstead*, 552 F.3d 769, 776-77 (9th Cir. 2008) (applying preponderance standard to enhancements based on the extent of the conspiracy). The amount of loss need not be determined with precision, rather the court need only make a reasonable estimate of the loss. *United States v. Najjor*, 255 F.3d 979, 985 (9th Cir. 2001); *see* U.S.S.G. § 2B1.1 n. 3(C) (2015).

### B.  Loss Calculation

The Guideline defines "actual loss" as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). The gain to the defendant is relevant only where "there is a loss but it reasonably cannot be determined." *Id*. at cmt. n.3(B). Here, the actual loss to the victim, Blue Shield of California ("BSC"), is reasonably determinable by the amount of the fraudulently obtained funds under the fraudulent arrangement for services in which the defendant was paying her co-defendant, Skylar Phoenix, for assistance with the placement and increase of business with the victim company. That defendant now claims that the loss number should be smaller based on a claim that BSC received some value, work, or services under one or both of the frauds does not change the focus on actual loss because that number is readily identifiable. *See United States v. Brown*, 2016 U.S. App. LEXIS 12807, *1 (9th Cir., July 12, 2016) (finding district court had not abused its discretion when it used the actual loss and not the gain to defendant as the relevant amount for the guideline calculation). As noted, however, the

district court "need not make its loss calculation with absolute precision," but instead can make a "reasonable estimate of the loss based on the available information." *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007).

### 1. COUNT SIX of INDICTMENT– "The Dana Wilkey/Adwil Scheme"

As described in the Indictment [¶¶ 24 – 33] and the PSR [¶¶ 14 – 16], BSC identified a scheme through which they were defrauded of funds by their employee, Skylar Phoenix, through the use of outside vendor contracts with the defendant and her company, Adwil Agency, Inc., because Ms. Wilkey had been making large payments (in the government's view, kickbacks) to Phoenix for (or in conjunction with) the placement of BSC marketing business with Adwil Agency. According to BSC, the receipt of BSC funds by Ms. Wilkey and Skylar Phoenix in this way was a direct violation of BSC vendor and employee policy, and they would not have engaged in any business with Ms. Wilkey's company had they known of the existence of the alleged kickbacks (or, as the defendants would characterize it, any "outside" business relationship between Ms. Wilkey and Skylar).

BSC and the FBI ultimately identified a total of 198 payments from BSC to Adwil Agency, made between December 2005 and July 2012, totaling **$1,566,332.29**. The evidence showed that Skylar Phoenix has known and had a "social" relationship with Dana Wilkey since at least 2005, and that in Skylar's capacity as a manager of the marketing department, she facilitated several contracts between BSC and Adwil Agency to provide a variety of internet-type work for BSC, including creation of "microsites," or specialized internet sites tailored to specific BSC insurance customers or potential customers. Multiple work orders or "Statements of Work" for internet-type work related to BSC marketing were generated, and over time, these involved numerous cost increases and extensions of the contract, all approved by Skylar.[2] While "microsite work" was produced by Adwil to the benefit of BSC, the majority of the invoices were artificially inflated based on the significant kickbacks being paid

---

[2] The government acknowledges that many of the work orders were "approved" by Skylar's supervisors at BSC (as they exceeded her dollar-amount authority); however, it is clear that none of those supervisors were aware of any outside business relationship between the vendor and their employee, which, according to BSC witnesses, violated employee policies of which Skylar was aware and would have been fatal to the business relationship between BSC and Adwil Agency. BSC did not, at the time of the fraudulent activities, have a corresponding vendor policy which would have made Ms. Wilkey explicitly aware of the conflict of interest. They do now.

to Skylar for the placement of the work with BSC.  Nevertheless, the value of services satisfactorily performed should be credited in the loss calculation, even amid other fraudulent conduct. *United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir. 1998) ("We have recognized that 'value may be rendered even amid fraudulent conduct,' and that in calculating intended loss, the district court should give credit for any legitimate services rendered to the victims." (quoting *Barnes*, 125 F.3d at 1291)); *United States v. Rutgard*, 116 F.3d 1270, 1294 (9th Cir. 1997) (holding that defendant, an ophthalmologist convicted of defrauding Medicare and other insurers, should receive credit in loss calculation for services rendered "that were justified by medical necessity," even while the value of unnecessary procedures would be considered loss); *United States v. Licciardi*, 30 F.3d 1127, 1134 (9th Cir. 1994) (holding that a broker of wine grapes who misrepresented the quality of his grapes should be given credit in loss calculation for the value of the grapes actually delivered to the fraud victim); *see* U.S.S.G. § 2B1.1 cmt. n.3(E)(i).

To determine the value of the credit, courts calculate "the fair market value of . . . the services rendered." U.S.S.G. § 2B1.1 cmt. n.3(E)(i).  That fair market value is subtracted from the paid contract price to reach the actual loss value for purposes of § 2B1.1 sentencing. *United States v. Martin*, 796 F.3d 1101, 1111 (9th Cir. 2015) ("It is conceivable that the government paid a premium contract price above what it would pay for other contracts under normal competitive bidding procedures. Any such difference would be an actual loss resulting from [the defendant's] fraud."); *United States v. Harris*, 821 F.3d 589, 607 (5th Cir. 2016) (treating the loss amount as "the difference between the contract price and the fair market value of services rendered").[3]

The mode of determining fair market value varies case by case. *Harris*, 821 F.3d at 606 ("[T]he fraud cases treated under § 2B1.1 are something of a mixed bag, involving different economic realities and different relationships among defendant, victim, and loss amount."); *Zolp*, 479 F.3d at 718 ("The guidelines do not present a single universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive and individualized nature of the inquiry."). The government "will bear the

---

[3] Both *Martin* and *Harris* are cases of government procurement fraud, and therefore both are additionally subject to the rule for procurement fraud in U.S.S.G. § 2B1.1 cmt. n.3(A)(v)(II), a subsection of the general rule for the calculation of loss under n.3(A). However, the method of calculation stated here—that loss equals contract price less fair market value—is distinct from the procurement fraud sub-rule, and therefore could be applied to any type of fraud.

burden of proof to show any difference between the contract price and the fair market value of the services rendered." *Harris*, 821 F.3d at 607. Again, this calculation need only be a "reasonable estimate . . . based on the available information." *Zolp*, 479 F.3d at 719. As an alternative, courts may calculate loss based on the defendant's gain if loss cannot otherwise be reasonably determined. U.S.S.G. § 2B1.1 cmt. n.3(B); *Martin*, 796 F.3d at 1111; *Zolp*, 479 F.3d at 719.

For purposes of the loss calculation for sentencing, as well as restitution, the government agrees that some credit is due to the defendant for the actual work performed by Adwil Agency and received by BSC. Because it is somewhat difficult to place an actual "value" on the microsites and other work delivered, the government believes a reasonably suitable alternative, providing a generous estimate to the defendant, is to subtract the amount of money Adwil Agency paid out to its "legitimate" workers associated with the BSC business – Del Currie/Spyglass Design, who was responsible for the actual design and coding of the websites, and Amy Shriver, who seemingly functioned as a project manager for Adwil's work with BSC. Through an examination of all the records, the government has determined that the total amount paid to Currie and Shriver was $**416,989.60**. Thus, if that number is subtracted from the total payments from BSC to Adwil, the loss attributable to Count Six is reduced to **$1,149,342.69**. Defense Counsel for Ms. Wilkey has further provided evidence of business expenses directly attributable to BSC similar in characterization to the Currie/Shriver payments (e.g., another contract worker providing content for the websites; a BSC-required insurance policy), for an additional total of $102,121. This would further reduce the loss amount to $**1,047,221**.[4]

Further, deductions to estimate "actual work" have been proposed by defense counsel from his review of Ms. Wilkey's tax filings for the years 2007 through 2012. Counsel has proposed an analysis of her business deductions using as a multiplier the percentage of her gross income that was attributable to the BSC payments to reasonably calculate the "overhead" deductions relevant to BSC. To that end, defense counsel offers a "business overhead" number of $307,406 to be credited. Accepting the defense number as the most reasonable estimate and subtracting that number from $1,047,221, the loss amount for guideline purposes resolves to **$739,815.69.**

---

[4] This is the "reduced" restitution amount found in the PSR in the Sentencing Recommendation. [*See* PSR, ¶ 21.]

The government believes this to be the reasonable estimate of loss to BSC, based on all available information, for purposes of the guideline calculation, and in any respect, is agreed to be above $550,000.

### C. Criminal History and Characteristics

The defendant has no prior criminal history other than a minor alcohol-related conviction as a young person over twenty years ago.  [*See* PSR, ¶ 36.]  She is mother to a young child, estranged from the child's father, and is the sole source of support for her elderly grandmother.  She is well-educated despite childhood traumas, and has worked consistently as an adult to meet her financial responsibilities.  In addition, through the course of this litigation, she has expressed a willingness to cooperate with the investigation, and provided information to the government on request to substantiate her position on both loss issues and to describe how she reasonably believed the statements of her co-defendant that she had secured permission to engage in this "double-dipping" with her employer, getting paid for both her normal job and for the "role" she played "on the Adwil side."  Moreover, she has expressed remorse in the PSR statement, by way of a detailed explanation to the Court and Probation which exceeds that of many similarly situated defendants.

A sentence of five years' probation, with a condition of six months' home confinement, would reflect the seriousness of the defendant's conduct, promote respect for the law, and provide just punishment for the offense.  The extended period of probation would likewise provide an extended period during which the government can be reasonably assured that payments will be made toward the full restitution to the victim.  The government does not believe that the defendant is likely to reoffend.

## III. Restitution

Section 3663A(a)(2) defines a victim as "a person directly and proximately harmed as a result of the commission of an offense."  "Restitution seeks to compensate the victim for all the direct and proximate losses resulting from the defendant's conduct, not only for the reasonably forseeable losses." *U.S. v. Gossi,* 608 F.3d 574, 581 (9th Cir. 2010).  The purpose of restitution is to put the victim back in the position he or she would have been but for the defendant's criminal conduct." *Id.*, at 581. Restitution is mandatory for any offense "in which an identifiable victim or victims have suffered a

physical injury or pecuniary loss." *See* 18 U.S.C. § 3663(A)(c)(1)(B).  The calculation of loss for restitution is therefore different than the calculation for sentencing, where the purpose is punitive. *United States v. Gordon*, 393 F.3d 1044, 1052 n.6 (9th Cir. 2004).

"The amount of restitution is . . . limited to the victim's actual losses." *United States v. Hunter*, 618 F.3d 1062, 1064 (9th Cir. 2010) (quoting *United States v. Bussell*, 504 F.3d 956, 964 (9th Cir. 2007)). "Actual loss for restitution purposes is determined by comparing what actually happened with what would have happened if the defendant had acted lawfully." *Hunter*, 618 F.3d at 1064 (quoting *Bussell*, 504 F.3d at 964).

The parties have agreed that the defendant, as restitution for her criminal activity, "irrespective of any loss determinations," shall pay jointly with her co-defendants, $1,047,221[5] to BSC.

## IV. Conclusion

In full consideration of the defendant's history and characteristics together with the other goals of sentencing, the government respectfully requests that the Court sentence the defendant to five years' probation, with six months' home confinement through electronic monitoring, and $1,047,221 in restitution.  The Court is required to impose the $100 special assessment.

DATED: October 12, 2016                Respectfully submitted,

                                       BRIAN J. STRETCH
                                       United States Attorney

                            _____    __/s/_____
                                        AMIE D. ROONEY
                                        Assistant United States Attorney

---

[5] This number is slightly decreased from the amount in the plea agreement based on the defendant having provided evidence for additional expenditures/overhead related directly to the BSC accounts (i.e., an insurance policy she was required to purchase at the direction of BSC; a copy writer contracted to provide content for the BSC related site work), which totaled approximately $100,000. [*See* PSR ¶ 21.]